IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WILLIAM E. WILSON,
     Plaintiff,

v.               Civil Action No. 1:04-CV-30

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A. Background

  Plaintiff, William E. Wilson, (Claimant), filed his Complaint on February 26, 2004 seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1] Commissioner filed her Answer on November 5, 2004.[2]

Claimant filed his Motion for Summary Judgment and Brief in Support Thereof on May 9, 2005.[3]

Commissioner filed her Motion for Summary Judgment and Brief in Support Thereof on June 9,

2005.[4]

B. The Pleadings

    1. Claimant's Motion for Summary Judgment and Brief in Support Thereof.

    2. Commissioner's Motion for Summary Judgment and Brief in Support

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 14.

[4] Docket Nos. 15.

Thereof.

C.    Recommendation

1.    I recommend that Claimant's Motion for Summary Judgment be  DENIED because the ALJ was substantially justified in his decision. Specifically the ALJ was correct in determining that Claimant's substance addiction was material to the disability issue. Also, the Commissioner is not barred by the doctrine of *res judicata*.  In addition, the ALJ gave proper weight to the opinions of Dr. Atkinson and Dr. Steward. Also, the ALJ properly assessed Claimant's RFC. In addition, the  hypothetical posed to the VE was proper. Lastly, there was no apparent conflict between the VE's testimony and the DOT.

2.    I recommend that Commissioner's Motion for Summary Judgement be GRANTED for the same reasons set forth above.

## II.  Facts

A.    Procedural History

On May 19,2000 Claimant filed for Supplemental Security Income alleging disability since January 6, 1996.  The application was denied initially and on reconsideration.  A hearing was held on March 21, 2002 before an ALJ.  The ALJ's decision dated June 21, 2002 denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on October 30, 2003.  This action was filed and proceeded as set forth above.

B.    Personal History

Claimant was 31 years old on the date of the March 21, 2002 hearing before the ALJ. Claimant has an eighth grade education and past relevant work experience as a truck driver,

newspaper distributor/proofreader, and a video rental clerk.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability January 6, 1996. - June 21, 2002:

**United Hospital Center**
**Gaspar Z. Barcinas, M.D. 1/7/96 Tr. 132**
- Impression: (1) Post splenectomy or ruptured spleen. (2) Fracture of subcapital left humerus and public ramus, rule out intracranial injury. (3) Rule out injury to the neck.

**United Hospital Center**
**Gary D. Marano 1/16/96 Tr. 133.**
- Impression: Left lower lobe atelectasis and/or infiltrate with left effusion, larger than on prior study of 1/11/96.

**United Hospital Center**
**Gerardo M. Lopez 1/14/96 Tr. 134.**
- Impression: Low probability for pulmonary embolism.

**United Hospital Center**
**Imad S. Basha 1/11/96 Tr. 136**
- Impression: Status post-chest tube placement on the right with minimal improvement in the right pneumothorax.
- Persistent lower lung zone consolidation bilaterally.

**United Hospital Center**
**Imad S. Basha 1/9/96 Tr. 137**
- Impression: Increased markings in the left base suggestive of hypoventilatory changes. Examination otherwise negative.

**United Hospital Center**
**Charles A. Lefubre 1/9/96 Tr. 138**
- Impression: Fracture of the neck of the left humerus with displacement. Would like additional views to better evaluate the scapula.

**United Health Center**
**Gaspar Z. Barcinas 1/13/96 Tr. 139**
- Impression: Right chest tube still present with the tip in the right parabillar area. There has been re-expansion of the right lung and there is no longer any pneumothorax. There is some pleural effusion in the left base.
**United Health Center**

**Imad S. Basha 1/11/96 Tr. 140**
- Impression: Persistent left lower lobe increased density and now interval development of right to lower lung zone increased density, both of which may represent atelectatic change; however, developing infiltrates cannot be excluded.

**United Health Center**
**Imad S. Basha 1/11/96 Tr. 141**
- Impression: Right pneumothorax. Persistent lower lung zone opacification.

**United Hospital Center**
**Imad Basha 1/9/96 Tr. 144-145**
- Impression: LV systolic function appeared preserved; estimated EF of about 50 to 55%. Normally LV chamber size. Endocardium is not well visualized, and because of that, I cannot comment on regional wall motion abnormality.
- Mitral valve leaflet excursion well preserved. No mitral stenosis or regurgitation.
- Aortic valve leaflet excursion well preserved. No aortic stenosis or regurgitation.
- No pericardial effusion.
- Tachycardia noted.
- No LV thrombus.

**United Hospital Center**
**Charles A. Lefubre 1/8/96 Tr. 147**
- Impression: Fracture of the proximal humerus. Questionable lucency in the acromion which could represent fracture.

**United Hospital Center**
**Gaspar Z. Barcinas 1/7/96 Tr. 148**
- Impression: Cervical Spine: C1 through C5 appear unremarkable on this single lateral portable view of the cervical spine. Chest: No infiltrate and no congestion. Pelvis: Fracture of left innominate bone involving the anterior lip of the acetabulum. Examination is otherwise negative.

**United Hospital Center**
**Gaspar Z. Barcinas 1/8/96 Tr. 150**
- Impression: Bilateral pleural effusions. There is some increased density in the lower lung fields. Atelectasis vs. infiltrates. There apparently has been a previous spelenectomy. There is a drain in place.

**United Hospital Center**
**Gaspar Z. Barcinas 1/7/96 Tr. 151**
- Impression: Oblique linear nondepressed skull fracture as described. Intracranially unremarkable. Negative for fracture involving C5 through T1.

**United Hospital Center**
**Gaspar Z. Barcinas 1/8/96 Tr. 154**

- Impression: Bibasilar infiltrates, left greater than right. There is consolidation of the left lung base. Prominent loops of bowel are noted. No free air is identified; however, free air is difficult to exclude on a supine radiograph. There is some irregularity along the lateral aspect of the lower left ribs. This may be due to sheets overlying the patient, though I cannot exclude a subtle rib fracture in this area.

**United Hospital Center**
**Frederick J. Gabriele 6/5/96 Tr. 173-174**
- Impression: Healing of pelvic bone fracture. Further callus formation and no change in alignment in proximal humerus fracture when compared to 3/13/96.

**United Hospital Center**
**Andrew W. Goodwin 1/11/97 Tr. 175-176**
- Impression: Healed fractures of the pelvis with some deformity of the superior ramus of the left pubic bone.
- Healed fracture of the proximal humerus with internal fixation.

**9/18/96 Tr. 177**
- Impression: Normal upper GI.

**West Virginia Disability Determination Service**
**Charles M. Paroda D.O., Ph.D. 12/16/97 Tr. 178-182**
- Impressions: Status-post trauma; emergency splenectomy. Left humeral fracture. Stable pelvic fracture.

**Medical Assessment of Ability to do Work-Related Activities**
**12/16/97 Tr. 183-185**
- Can lift occasionally 25-30 lbs., frequently 5-25 lbs.
- Standing/walking and sitting are not affected by impairment.
- Can perform all postural activities frequently.
- Overhead reaching is limited. All other physical functions not limited.
- No environmental restraints.

**United Hospital Center**
**Charles LeFlebure 1/31/96 Tr. 323-324**
- Impression: Chest - Near complete (illegible) of the left pleural effusion with slight residual blunting of the (illegible) angle.
- Fracture of the neck of the left humerus with slight impaction.
- Pelvis - Fractures of the right superior and inferior public ranus, the left superior public ranus and the left acetabulum.

**United Summit Center**
**Tammy (illegible) 1/7/98 Tr. 399-406**
- Impressions: Uses pain pills on a regular basis. Regular doctor believes he is addicted.

**William R. Sharpe, Jr. Hospital**
**John H. McWhorter, M.D. 12/22/95 Tr. 410-412**
- Diagnostic Impression: Axis I: Bipolar Disorder, Acute Manic. Alcohol abuse.
- Axis II: Negative.
- Axis III: Negative.

**Braxton County Memorial Hospital**
**Jose D. Bordonada, M.D. 1/6/96 Tr. 420-421**
- Pre-operative diagnosis: Ruptured spleen with intra-abdominal bleeding.
- Post-operative diagnosis: Ruptured spleen with intra-abdominal bleeding, contusion of the greater omentum.

**Jose D. Bordonada, M.D. 1/6/96 Tr. 422**
- Impression: Question minimal nondisplaced right tenth rib fracture posteriorly. Two radiopaque densities overlying the right lower quadrant.

**United Hospital Center**
**Mack I. McClain 3/13/96 Tr. 431**
- Examination again reveals the internally fixed fracture of the neck and head of the humerus. The fracture appears to be healing. There is callous formation. There has been no change in alignment or position.

**United Hospital Center**
**Charles A. Lefubre 2/21/96 Tr. 432**
- Impression: Uniting impacted fracture of the proximal left humerus. No change since prior study.

**Romeo Y. Lim, M.D. 3/25/92 Tr. 435**
- Clinical impression: Acute tonsillitis, worse right.

**Worthington Center, Inc.**
**John R. Atkinson, Jr. MA. 7/8/96 Tr. 437-448**
- Conclusions-Diagnosis: Axis I: Dysthymic Disorder, Pain disorder with both psychological factors and a general medical condition. Cognitive disorder NOS, Cannabis abuse and mathematics disorder.
- Axis II: Borderline intellectual functioning mixed personality trait disturbance with passive aggressive, paranoid, and obsessive qualities.
- Axis III: See medical report.
- Axis IV: No acute event relevant to disorder.
- Axis V: GAF: 60, moderate symptoms.

**Psychiatric Review Technique**
**7/8/98 Tr. 452-460**

- Affective disorders.
- Somatoform disorders.
- Depressive syndrome with appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, difficulty concentrating, thoughts of suicide and hallucinations, delusions or paranoid thinking.
- Manic syndrome and bipolar syndrome
- Somatoform disorders: physical symptoms for which there are some demonstrable organic findings or known physiological mechanisms.
- Personality disorders: persistent disturbances of mood or affect. Hostile, alienated.
- Moderate restrictions on daily activities and maintaining social functioning.
- Frequent deficiencies of concentration.
- One or two episodes of deterioration or decompensation in work or work-like settings.

**Mental Residual Functional Capacity Assessment**
**7/8/98 Tr. 461-463**
- Moderately limited in ability to understand and remember detailed instructions.
- Moderately limited when carrying out detailed instructions, sustaining an ordinary routine and when working in coordination with or proximity to others without being distracted by them.
- Markedly limited when maintaining attention and concentration for extended periods and when performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances.
- Markedly limited when completing a normal workday without interruptions from psychologically based symptoms.
- Moderately limited in accepting instructions and responding appropriately to criticism from supervisors and getting along with coworkers without distracting them.
- Markedly limited in ability to interact appropriately with the general public.
- Moderately limited in ability to respond appropriately to changes in work setting.

**Psychiatric Review Technique**
**7/29/98 Tr. 483-491**
- RFC Assessment Necessary.
- Affective disorders.
- Mental retardation and autism.
- Personality disorders.
- Disturbance of mood, accompanied by a full or partial manic or depressive syndrome.
- IQ=77.
- Persistent disturbances of mood or affect.
- Pathological dependence, passivity, or aggressivity.
- No substance addiction disorders.
- Slight restriction of daily living activities.
- Moderate difficulties in maintaining social functioning.
- Often deficiencies of concentration, persistence of pace resulting in failure to complete tasks in a timely manner.

- One or two episodes of deterioration or decompensation in work or work-like settings.

**Mental Residual Functional Capacity Assessment**
**7/29/98 Tr. 492-494**
- Moderately limited in ability to understand and remember detailed instructions and when maintaining attention and concentration for extended periods.
- Moderately limited when carrying out detailed instructions, sustaining an ordinary routine and when working in coordination with or proximity to others without being distracted by them.
- Moderately limited when completing a normal workday without interruptions from psychologically based symptoms.
- Moderately limited in accepting instructions and responding appropriately to criticism from supervisors and getting along with coworkers without distracting them.
- Moderately limited in ability to interact appropriately with the general public.

**West Virginia Disability Determination Service**
**Arturo Sabio, MD 10/28/98 Tr. 496-501**
- Impressions: Frozen left shoulder, chronic back strain, status post splenectomy.

**ELI Rubenstein, MD, Inc. 10/20/98 Tr. 502**
- Impression: Normal lumbar spine.

**Residual Functional Capacity Assessment**
**11/19/98 Tr. 503-510**
- Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., stand and/or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push or pull.
- Postural limitations: All frequently limited.
- Manipulative limitations: Reaching all directions limited.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: Avoid concentrated exposure to hazards. All others unlimited.

**Braxton County Memorial Hospital**
**1/23/99 Tr. 571**
- Diagnosis: Flare up of chronic back pain disorder.

**Braxton County Memorial Hospital**
**John Reffsteck, M.D. 1/23/99 Tr. 574**
- Impression: No signs of fracture spondylosis, subluxation, or marked degenerative changes.

**Neurological Associates, Inc.**
**C.Y. Amores, M.D. 5/23/99 Tr. 579**
- Impression: Chronic pain problem of non-neurosurgical nature.

**Residual Functional Capacity Assessment**
**Antoine Katiny, M.D. 6/2/99 Tr. 581-586**
- In 8 hour day he can perform light work, doing a significant amount of walking and standing lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling.
- In 8 hour day he can perform sedentary work, sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds**.**
- Could sit for 4 hours in an 8 hour day, sitting for 1 hour at a time.
- Could walk for 2 hours in an 8 hour day, walking for ½ hour at a time.
- Could stand for 3 hours in an 8 hour day, standing for ½ hour at a time.
- Environmental hazard restriction.
- Needs to have frequent rest periods throughout day.

**OHA Psychiatric Review Technique Form**
**5/24/2000 Tr. 603-605**
- Affective Disorder.
- Depression.
- Marked difficulties in maintaining social functioning.
- Constant deficiencies of concentration, persistence or pace resulting in failure to compete tasks in a timely manner.
- Repeated (3+) episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or experience exacerbation of signs and symptoms.

**Physical Residual Functional Capacity Assessment**
**3/2/01 Tr. 667-674**
- Exertional limitations: Occasionally 20 lbs., frequently 10 lbs., stand and/or walk 2 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
- Postural limitations: All occasionally limited.
- Manipulative limitations: Limited reaching in all directions. All others unlimited.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: Avoid concentrated exposure to hazards. All others unlimited.
- Symptoms are attributable to a medically determinable impairment.

**Psychiatric Evaluation**
**Simon McClure, M.D. 8/9/00 Tr. 708-709**
- Impression: Axis I: Rule out intermittent substance misuse. Major depression, single, chronic, moderately severe without psychotic features or imminent suicidal or homicidal thoughts.
- Axis II: Deferred.
- Axis III: Status post injuries sustained to left shoulder resulting in chronic pain.
- Axis IV: Psychosocial stressors.

**Neurological Associates, Inc.**
**Frederick H. Armbrust 1/10/00 Tr. 715**
- Impression: Chronic back pain (since 1996.)

**Psychiatric Review Technique**
**Frank D. Roman 1/23/01 Tr. 722-735**
- RFC Assessment Necessary.
- Affective Disorders.
- Moderate restriction of daily living activities.
- Moderate difficulties in maintaining social functioning, concentration, persistence, or pace.
- One or two repeated episodes of decompensation, each of extended duration.

**Mental Residual Functional Capacity Assessment**
**1/23/01 Tr. 736-738**
- Moderately limited in ability to understand, remember and carry out detailed instructions.
- Moderately limited in ability to maintain attention and concentration for extended periods and perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
- Moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.

**West Virginia Disability Determination Services**
**Arturo Sabio, M.D. 2/27/01 Tr. 745**
- Impressions: Chronic low back strain. Chronic hip strain. Impacted fracture of the left shoulder, which is healed. Posttraumatic degenerative arthrosis of the left shoulder.

**Eli Rubenstein, M.D. 2/22/01 Tr. 747**
- Impression: Narrowing of L-5 S-1.

**Braxton County Memorial Hospital**
**Jose D. Bordonada, M.D. 2/9/00 Tr. 781**
- Pre-operative diagnosis: Bilateral ingrown nails of big toes.
- Post-operative diagnosis: Same.

**Braxton County Memorial Hospital**
**Jose D. Bordonada, M.D. 4/13/00 Tr. 782**
- Pre-operative diagnosis: Recurrent ganglion cyst right dorsal wrist.
- Post-operative diagnosis: Same.

**Braxton County Memorial Hospital**
**Jose D. Bordonada, M.D. 12/2/99 Tr. 785**
- Pre-operative diagnosis: Cyst, left posterior wrist and also a large ganglion cyst right

wrist.
- Post-operative diagnosis: Same.

**Braxton County Memorial Hospital**
**Jose D. Bordonada, M.D.  12/1/99 Tr. 788**
- Diagnostic impression: Ganglion cyst right wrist, posterior and ulnar side. Sebaceous cyst, left scapula.

**Charleston Area Medical Center**
**Milton J. Plata, M.D. 12/6/99 Tr. 798**
- Diagnosis: Cyst, left posterior shoulder: sebaceous cyst.
- Cyst, right wrist: ganglion cyst with focal histiocytic reaction.

**Pamela Phillips, M.D. 4/6/00 Tr. 801**
- Impression: No focal infiltrate.

**Braxton County Memorial Hospital**
**John Willis, M.D. 11/3/99 Tr. 802**
- Impression: Negative lumbar spine series.

**Psychiatric Review Technique**
**Samuel Goots, Ph.D. 8/7/01 Tr. 804-817**
- RFC Assessment Necessary.
- Organic Mental Disorders. (B.F.)
- Affective Disorders.
- Mild restriction of daily living activities.
- Moderate difficulties in maintaining social functioning.
- Moderate difficulties in maintaining concentration, persistence, or pace.
- No repeated episodes of decompensation.
- Evidence does not establish presence of "C" criteria.

**Mental Residual Functional Capacity Assessment**
**Samuel Goots, Ph.D 8/7/01 Tr. 818-820**
- Moderately limited in ability to understand, remember and carry out detailed instructions.
- Moderately limited in ability to maintain attention and concentration for extended periods and sustaining an ordinary routine without special supervision.

**Physical Residual Functional Capacity Assessment**
**8/8/01 Tr. 822-829**
- Exertional limitations: Occasionally 20 lbs., frequently 10 lbs., stand and/or walk 2 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
- Postural limitations: Should never climb a ladder/rope/scaffolds. All others occasionally limited.
- Manipulative limitations: Limited when reaching in all directions.

- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: Avoid concentrated exposure to vibrations and hazards.

**West Virginia University Hospitals**
**Ronald Albuquerque 9/16/01 Tr. 833-834**
- Preoperative diagnosis: Gastroesophageal reflux disease.
- Postoperative diagnosis: Mild reflux esophagitis. Gastritis. Superficial duodenal erosions.

**WV Pain Treatment Center**
**Karl G. Hursey, Ph.D. 11/28/01 Tr. 843**
- Impressions: 307.89 Pain disorder associated with psychological factors and general medical condition.
- V15.81 Noncompliance with treatment for a general medical condition (Pain).
- 316.00c Coping style affecting general medical condition.

**Center for Epidemiological Studies-Depression**
**11/28/01 Tr. 848**
- Interpretation: The total score is severely elevated.

**Cardinal Psychological Services, L.L.C.**
**Wilda Posey, M.A. and L. Andrew Steward, Ph.D. 5/5/02 Tr. 865**
- Diagnostic impression: Axis I: 294.9 Cognitive disorder, NOS. 296.32 Major depressive disorder, moderate without psychotic features, recurrent. 304.4 Cannabis Dependency. 305.50 Opioid abuse.
- Axis II: V62.89 Borderline intellectual functioning. Traits of Cluster C personality disorder, dependent personality, obsessive compulsive.
- Axis III: Chronic pain, hypothyroidism, headaches.
- Axis IV: Lack of emotional and financial support.
- Axis V: Current GAF of 55.

**Mental Residual Functional Capacity Assessment**
**L. Andrew Steward, Ph.D. 3/11/02 Tr. 867-870**
- Moderately limited in ability to understand, remember and carry out detailed instructions.
- Moderately limited in ability to perform activities within a schedule, maintain regular attendance, sustain an ordinary routine without supervision and work in coordination with or proximity to others without being distracted by them.
- Moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.
- Moderately limited in accepting instructions and respond appropriately to criticism from supervisors.
- Moderately limited in ability to be aware of normal hazards and take appropriate precautions as well as setting realistic goals or make plans independently of others.
- Has a fair ability to deal with work stress and function independently.

- Fair ability to relate predictably in social situations and demonstrate reliability. Poor ability to behave in an emotionally stable manner.

**Psychiatric Review Technique**
**L. W. Stewart, Ph.D. 3/12/02 Tr. 871-884**
- Affective disorders.
- Depressive syndrome characterized by: ambedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, and difficulty concentrating or thinking.
- Mild restriction of activities of daily living.
- Mild difficulties in maintaining social functioning.
- Moderate difficulties in maintaining concentration, persistence, or pace.

**Summersville Multi-Clinic**
**Miraflor G. Khorshad, M.D. 5/23/02 Tr. 889**
- Conclusion: Patient has multiple injuries subsequent to the motor vehicle accident in 1/6/96 which had caused him limited functions on his left shoulder and left arm.
- With his present injuries I feel that (he) is not capable of performing the job he was trained for. And with his limited educational background, he is a poor candidate for vocational rehabilitation. I recommend continued medical assistance for a rigid psychiatric treatment, good pain management program and drug rehabilitation.

**General Medical Examination and Assessment**
**Miraflor G. Khorshad, M.D. 3/5/02 Tr. 890-904**
- Impressions: Recent sustained fracture of left patella and left 5th metacarpal. Chronic back pain. Panic disorder with both psychological and medical conditions. Substance abuse. Moderate intellectual functioning with mixed personality disorder - Clinical history.
- Limited push and pull.
- Presently patient is not able to put pressure or use left lower leg and because of sustained fracture of the pelvis he manifests persistent lower back pain.
- Patient is not able to stand on his own because of left knee injury.
- Patient is not able to stand, walk or balance himself.
- Must take breaks throughout workday and should elevate feet.
- Can use right hand for repetitive actions and reaching, no loss of grip strength in right hand. Left hand has loss of grip strength and cannot be used for repetitive actions and reaching.
- Postural limitations: All categories should not be performed.
- Environmental limitations: All are restricted except for hot weather/ hot work conditions.
- Patient is not capable of performing full-time work, 8 hours per day, 40 hours per week.

**St. Joseph's Hospital**
**J.P. Galey, M.D. 3/8/02 Tr. 909**
- Impression: The more posterior screw does not traverse the fracture site and does not

include the lower pole fragment.

**St. Joseph's Hospital**
**J. P. Galey, M.D. 3/22/02 Tr. 923**
- Preoperative diagnosis: Loss of fixation screws in the left patella.
- Postoperative diagnosis: Same.

**St. Joseph's Hospital**
**Roberto Cunanan, M.D. 3/22/02 Tr. 925**
- Impression: Examination of left knee using the C-arm shows that the screws and wires along the patella have been removed and replaced with another wire in a figure-of-eight keeping the fracture of the patella in place. The new wire appears to be in good position.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 5/16/02 Tr. 940**
- GERD. Chronic pain secondary to old trauma. History of depression.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 6/13/02 Tr. 942**
- GERD. Chronic pain secondary to old trauma.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 7/17/02 Tr. 942**
- GERD, stable on current therapy. Chronic pain.

**Tri- County Health Clinic**
**Michael D. Kirk, M.D. 8/11/02 Tr. 943**
- Chronic pain. Depression, chronic.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D.9/12/02 Tr. 944**
- Depression. Exertional nausea, rule out that this is an anginal equivalent. Erectile dysfunction.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 10/11/02 Tr. 948**
- Bronchospasm. Chronic pain. Left lower quadrant abdominal pain, nonspecific exam. Depression. Tobacco abuse.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 11/11/02 Tr. 950**
- Chronic pain. Erectile dysfunction. History of hypothyroidism with normal TSH off of any therapy. Depression, stable.

**Tri-County Health Clinic**

**Michael D. Kirk, M.D. 1/10/03 Tr. 951**
•      Erectile dysfunction. Chronic pain, stable.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 2/10/03 Tr. 951**
•      Vague abdominal symptoms which I think are related more than anything else and possibly representing a mild irritable bowel syndrome. Chronic pain which is stable on current therapy. Erectile dysfunction, doing well on current therapy.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 3/10/03 Tr. 952**
•      COPD with some increase of symptoms recently. Vague abdominal symptoms possibly related to irritable bowel syndrome versus GERD.

**Tri-County Health Clinic**
**Michael D. Kirk, M.D. 4/7/03 Tr. 953**
•      Tobacco addiction. Chronic pain.

**Safwat Attia, M.D. 9/18/02 Tr. 958**
•      Diganosis: Axis I: Polysubstance dependence. Mood disorder secondary to head injury. Cognitive dysfunction secondary to head injury.
•      Axis II: Narcisstic personality traits.
•      Axis III: Status-post head injury. Stomach disorder. Pain disorder related to injury.
•      Axis IV: Moderate stressor related to medical and social problems.
•      Axis V: GAF is 65.

D.     <u>Testimonial Evidence</u>

<u>1. Claimant</u>

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 980-89, 993):

Q      You don't remember?  Okay.  All right.  Well, let me ask you this, after you had your original accident, you know, the first, the real bad one where you were really banged up, do you feel that you had any change in your ability to think or concentrate or anything like that?

A      I can't stay concentrated on things, you know, for a period of time.  I get lost, you know, like if I am talking, I might forget what I was talking about.

\*　　　\*　　　\*

Q       Okay.  All right.  Now talking about the things that were wrong with you before you had this last accident, were you having any back pain?

A       After the accident, I have had back problems since.

Q       Did you have any problem with your legs?

A       Not before the accident.

Q       Well, how about after the accident?

A       Yeah.  My back will hurt and the pain just radiates down my legs.  My legs will get weak.  You know it just bothers me, and it has been bothering me ever since.

\*　　　\*　　　\*

Q       Did you have trouble with your legs after that?

A       Yes.

Q       Well, what kind of trouble did you have?

A       I would just have trouble walking far distances, standing for a period of time or sitting for a period of time; I just get to hurting and aching.

Q       Okay.  Now have you been in a good bit of pain?

A       Yeah, I have had more than one person should have to deal with.

\*　　　\*　　　\*

Q       Did the surgery work?

A       Well, as far as, it worked as far as, you know, wiring the bones back together, but the surgery itself damaged skin nerves in my left arm all the time tingles and goes numb, gets like a slight burning sensation in it.

Q Do you have trouble moving it around?

A Yeah, I have lost some use of my left arm.

Q Okay.  Does it hurt other than the burning?  In other words, if you are reaching or stretching or doing anything like that?

A If I raise it too high or move it too quick or something like that, it hurts.

Q The pain that you are talking about that has caused you to go for the pain medicine, where is the worst pain that you have?

A My back and legs.

Q Okay.  Now could you tell me on a scale, now you know zero is no pain and ten is the worst pain; that is the kind you probably need to go to the emergency room; where is your pain most of the time, between zero and eight, I mean zero and ten, if you could tell me?

A It is mostly generally around eight to ten.

*   *   *

Q Okay.  Do you have any trouble lifting and carrying?  Now I am not talking about right this minute, but here back before you had this accident in March, this month, were you having any trouble lifting and carrying things?

A Yeah.  I can't lift anything, well, I don't have the strength in my left arm as I do in my right arm because I have lost some strength in my left arm.  I used to try to, you know, move things, you know, but I just get myself down in the back, and after a few times of putting my back out, you know, the pain isn't worth it.

*   *   *

Q Okay.  Does - - do you have trouble with your nerves?

17

A      Yeah.

Q      Could you tell me about that?

A      Well, I just, I sit around. I shake a lot. Like I say, I can't sleep at night, you know, I am up all day. I hurt all day and hurt all night. And it - -

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 1000-1005):

Q      Okay, and unskilled, low stress work, sir, low stress defined as one and two step processes, routine and repetitive tasks, primarily working with things rather than people, entry level, sedentary, sit/stand, no repetitive bending or overhead reaching, no hazards, unskilled, low stress. With these cumulative limitations, sir, can you enumerate any jobs that this hypothetical individual can perform?

A      Okay, sedentary work, surveillance system monitor, it is unskilled, SVP 2 level, you have 200,000 for the national, for the regional you have 4,000. Sedentary work as a type copy examiner, unskilled, also SVP 2 level, you are looking at 90,000 for the national, with around 850 for the regional. Sedentary work as a document preparer, unskilled, SVP 2, you have 60,000 for the national and 800 for the regional. And those are a sampling which is not all exclusive.

Q      Thank you. Do those jobs actually entail lifting ten pounds?

A      No, Your Honor. Surveillance system is no lifting, type copy examiner, you break it down usually to five, document preparer, also I would say that you could easily do it with a five pound restriction.

*         *         *

Q        Okay.  We have got a situation where the person is limited in more directions than just forward flexion.  You know, this person is also significantly limited in abduction, and so we should say that this person should have no repetitive reaching, and no only reaching forward, reaching up, reaching to the side, and this is because of the limitation of the left shoulder which has been referred to markedly limited decrease.  I am wondering if just that alone would have any impact on the jobs that you have identified?

A        Basically if we just say a one-handed individual - -

Q        Okay.

A        - - that would take away his ability to perform the document preparer position.

Q        Okay.  Well, I would not quite put the case that strongly.  In other words, I think he has some use of the left arm and hand, but certainly no repetitive reaching with that left shoulder and arm.  Is the answer still the same?  Do those jobs - -

A        I would say so.  You need - - to do a good job as a document preparer, take out staples and what not, you are going to be using both hands.

Q        Okay.  And if we have an individual who is in chronic pain at least at the moderately severe level, now this pain may come from both physical and psychological sources, but nevertheless, it is experienced as at least moderately severe pain most of the time, with a corresponding impact on the ability to pay attention and concentrate, stay on task, what impact would that have on the ability to work the jobs you enumerated on a full-time basis?

A        Keeping in mind that pain is subject and everybody - -

Q        Uh-huh.

A          - - has a different response, if it prevents the person from staying on task consistently, then we are going to have an individual who is going to have problems doing work.

Q          Meaning sustained?

A          Meaning - - well, if we are talking about, customarily what we are looking for with unskilled, if the individual is not on task for greater than 15 minutes for the type copy examiner and the surveillance system monitor, and that is greater than 15 minutes for the hour worked, with the surveillance system monitor, since you are looking at a screen, you have to stay on task at least where you are at that site for 55 minutes for each hour.  So you looking at 5 minutes that an individual could, you know, doze off from doing something or, you know, talk to somebody else, but because of the severity, if something would happen during that time, the company would be liable for it; there is no chance of it being longer than that except when the person is on break.

Q          Okay.  I would like for you to assume that approximately one-half to two-thirds of the time the person is going to be unable to maintain a regular work schedule and perform an ordinary work routine without unusual supervision, and the same is true with tolerating a full work day without too many interruptions.  I think we have to consider pace in this as well because we have an individual who operates at a very slowed pace.  Now it is uncertain how much of this is psychomotor due to depression or how much is organic, it is uncertain, but he does have an extremely slow thought process.  What, if any, impact would those limitations have?

A          The combination that frequently you are talking about sheltered employment, non-substantial gainful employment.

Q       Okay.  Now if we have an individual who is said to have a poor ability to maintain emotional stability, and that corresponds to - - well, just poor ability to maintain emotional stability and that this person is going to be likely to demonstrate unacceptable behavior due to a loss of control, emotional control - -

A       When you talk about that, definitely you are avoiding working with people because that will affect the customer relationship with a company.  Also you have got to avoid positions where other people have to depend on him where he works like a team.  Now, you know, a lot of that, when you talk about it, depends on how the person reacts to that.  If somebody has poor emotional stability and they start throwing things, breaking things, obviously they are not going to want us in a job; no employer is going to tolerate that.  If they start talking to themselves, well, as a document preparer, as a type copy examine reader, as a surveillance system monitor, nobody really cares.

*          *          *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       Well, if we have an individual who, one-half to two-thirds of the time, is impaired in the ability to work in coordination with other people, to accept instruction or criticism from a supervisor, any impact on those jobs that you identified?

A       You know, we all have to take directions from our supervisor, I mean they tell us, this is what you need to do today.  If he can't do that at all or very limited in doing that, or reacts to the supervisor like the heck with you, I am not going to do that, obviously he is not going to keep a job, he is going to be fired.  Therefore, he would not be able to work.

E.     <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

• Claimant can lift a gallon of milk with right hand. (Tr. 990)

• Can walk 70 feet. (Tr. 991).

• Watches tv. (Tr. 992).

• Smokes marijuana. (Tr. 994).

• Sells tips (raffle) to Bingo players. (Tr. 971).

## II. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred in finding that claimant's drug addiction is material to the disability issue. Also, Claimant asserts that the Commissioner is barred by the doctrine of *res judicata* from contending that Claimant's substance abuse is material to disability issue. In addition, Claimant contends that the ALJ failed to give proper weight to psychological and psychiatric assessments. Also, Claimant asserts that the ALJ failed to express Claimant's mental limitations in the RFC assessment. In addition, Claimant contends that the ALJ posed an improper hypothetical to the Vocational Expert (VE). Lastly, Claimant asserts that the VE's testimony conflicts with the Dictionary of Occupational Titles (DOT.)

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ was correct in finding Claimant's drug addiction material to the disability issue. Also, Commissioner asserts that she is not barred by *res judicata.*

In addition, Commissioner contends that the ALJ gave proper weight to the psychological assessments of Claimant's psychiatrists and psychologist. Also, Commissioner asserts that the ALJ properly assessment Claimant's RFC. In addition, Commissioner contends that the hypothetical posed to the VE was correct. Lastly, Commissioner asserts that the VE's testimony was consistent with the DOT.

B.     The Standards.

1.     Summary Judgment.     Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.     Judicial Review.     Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hayes v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.      Social Security - Non-treating physician.  It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence.  Hayes, 907 F.2d at 1456.  The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner.  Id.

11.      Social Security - Vocational Expert - Hypothetical.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).  The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at

*5 (4th Cir. Jan.11, 1999)[5], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations. Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

12.     Vocational Expert and the DOT. SSR 00-4p states in part that "occupational evidence provided by a VE or vocational specialist (VS) should be consistent with the occupational information supplied by the D.O.T. When there is an apparent unresolved conflict between VE or VS evidence and the D.O.T., the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled."

13.     Social Security - Residual Functional Capacity. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their

_____

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

impairments.  Id.

14.  <u>Drug Abuse and Alcohol - Sequential Analysis</u>.  In determining disability when a claimant alleges drug addiction or alcoholism, the Commissioner must engage in a three step sequential analysis and determine: 1) whether claimant meets the disability standard based on all of his impairments, if the ALJ determines that claimant is disabled then he must determine 2) whether there is medical evidence of claimant's drug addiction or alcoholism; and 3) whether claimant's drug addiction or alcoholism is a contributing factor material to the determination of disability.  20 C.F.R. § 404.1535(a).

15.  <u>Drug and Alcohol Abuse - Materiality Determination</u>.  The key factor used by the Commissioner in the third step is whether the Commissioner would still find the claimant disabled if the claimant stopped using drugs or alcohol.  20 C.F.R. § 404.1535(b).  The Commission determines which of the claimant's physical and mental impairments would remain if the claimant stopped using drugs or alcohol and then whether any or all of the claimant's remaining limitations would be disabling.  20 C.F.R. § 404.1535 (b)(2).  If the Commissioner determines that the remaining limitations would not be disabling, the Commissioner will find that the claimant's drug addiction or alcohol is a contributing factor material to the determination of disability and deny benefits.  20 C.F.R. § 404.1535(b)(2)(i).

C.  <u>Discussion</u>

1. <u>Drug and Alcohol Abuse</u>

Claimant asserts that Claimant's drug addiction was immaterial to the disability issue. Commissioner counters that the ALJ was correct in finding Claimant's drug addiction material to the disability issue.

In determining disability when a claimant alleges drug addiction or alcoholism, the Commissioner must engage in a three step sequential analysis and determine: 1) whether claimant meets the disability standard based on all of his impairments, if the ALJ determines that claimant is disabled then he must determine 2) whether there is medical evidence of claimant's drug addiction or alcoholism; and 3) whether claimant's drug addiction or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535(a). The key factor used by the Commissioner in the third step is whether the Commissioner would still find the claimant disabled if the claimant stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b). The Commission determines which of the claimant's physical and mental impairments would remain if the claimant stopped using drugs or alcohol and then whether any or all of the claimant's remaining limitations would be disabling. 20 C.F.R. § 404.1535 (b)(2). If the Commissioner determines that the remaining limitations would not be disabling, the Commissioner will find that the claimant's drug addiction or alcohol is a contributing factor material to the determination of disability and deny benefits. 20 C.F.R. § 404.1535(b)(2)(i).

First, the ALJ found that based on all of his impairments, Claimant was disabled as of May 19, 2000. (Tr. 35). Second, there is medical evidence in the record supporting Claimant's drug addiction. "[C]laimant testified to using marijuana six of the seven days leading to the hearing, and has described multiple instances of improper use of both prescribed and illegal narcotic and other medication, including Oxycontin, Percocet, Lorcet, Talwin, and Valium." (Tr. 34). "He has admitted to "doctor shopping" in order to obtain desired prescription drugs." (Tr. 34). Claimant testified that he obtained "prescription drugs from friends, including Lorcet and Percocet the previous month." (Tr. 35). Further, psychologist Karl G. Hursey, Ph.D. "expressed

opinion in November 2001 that the claimant was a poor candidate for chronic opioid medication, because he was likely to have difficult adhering consistently to any treatment plan, and likely to enter into power struggles with his doctors." (Tr. 38). Other doctors indicated their concerns for Claimant's demands for large doses of narcotic drugs. Dr. Francis M. Saldhanha indicated that the claimant "had no condition warranting large doses of narcotics on a regular basis, and expressed related concerns in that regard." (Tr. 38). Psychiatrist Simon McClue, M.D. noted that claimant had obtained Lorcet "on the street" and voiced similar concerns relating to this." (Tr. 38).

Third, the ALJ determined that "independent of any substance addiction disorder, the claimant has no mental disorder imposing more than a moderate limitation on his social functioning and concentration, persistence of pace, or more than mild limitation on his activities of daily living." (Tr. 36). The ALJ observed that the claimant has since May 2001 "reported working two evenings per week at the Moose Lodge." (Tr. 39). Claimant also drives the vehicle involved in his accident of March 4, 2002 and was able to keep scheduled appointments despite being bound to a wheelchair. (Tr. 39). Finally, Claimant reported to Dr. Hursey in 2001 that he was "independent with activities of daily living and household chores." (Tr. 40). In light of these factors, the ALJ determined that the Claimant " has significant functional capabilities if and when properly motivated, absent the debilitating effects of chronic substance abuse." (Tr. 39). Therefore, having met all listed criteria, the ALJ properly determined that Claimant's drug addiction was a material factor to the disability issue.

## 2. *Res Judicata*

Claimant asserts that Commissioner is barred by the doctrine of *res judicata* from asserting Claimant's substance abuse is material to disability issue because it was determined that

Claimant's substance abuse was not material in a prior decision. Commissioner counters that she is not barred by *res judicata.*

"Res judicata precludes the assertion of a claim after a judgement on the merits in a prior suit by parties or their privies based on the same cause of action. Meekins v. United Transp. Union, 946 F.2d 1054 (4th Cir. 1991). See also Aliff v. Joy Mfg. Co., 914 F.2d 39, 43-44 (4th cir. 1990) (noting that claims precluded by res judicata include those that existed at the time of the first suit and might have been offered in the same cause of action). "To the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of [claim] preclusion apply with full force." Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473, 476 (4th Cir. 1999).

The Claimant's argument that Commissioner is barred by *res judicata* is without merit. Claimant contends that the best evidence of his functioning prior to development of substance abuse is Commissioner's prior decision. However, the Commissioner's decision in Claimant's 1996 Social Security Income is inconclusive of Claimant's functional behavior because it does not include subsequent psychiatric and psychological evaluations that have been performed since Commissioner made her decision. F urther, the Commissioner is not barred by *res judicata* because the time period at issue in May 2002 Social Security Income claim is a different time period than the time period adjudicated by the 1996 Social Security Income claim. Therefore, basing his decision on the current substantial evidence of record in addition to Claimant's testimony of pain and daily activities, the ALJ made a proper determination in this case.

### 3. Opinion Non-Treating Psychiatrist

Claimant contends that ALJ failed to give proper weight to the assessments and opinions

of Dr. Atkinson and Dr. Steward. Commissioner counters that the ALJ properly weighed the medical evidence.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hayes, 907 F.2d at 1456. The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

Dr. Atkinson is not a treating psychologist, nor is Dr. Steward a treating psychiatrist of the Claimant. Dr. Atkinson examined the Claimant at the insistence of Claimant's counsel. (Tr. 42). Also, Dr. Steward performed only a single evaluation of the Claimant.

In the present case, Dr. Atkinson's opinion is inconsistent with the substantial evidence in the case record. Dr. Atkinson opined that Claimant's behavior of getting pain pills off the street was "common in individuals with pain syndrome as an attempt to get medication for relief, and that often medical personnel interpret this as drug seeking behavior and withhold such medications." (Tr. 42). In addition, Dr. Atkinson opined his significant concern related to "claimant's ability with regard to extended concentration, maintaining a schedule, and interacting with the public." (Tr. 42). The ALJ determined that Dr. Atkinson's opinion "indicates no effort to assess or distinguish the claimant's capabilities or demeanor absent the effects of illicit drugs or alcohol, the use of which were both indicated by the claimant during the examination." (Tr. 42). In comparison, Dr. Sabio noted during his examination that the Claimant complained of "poor memory and concentration since the [1996] accident" as well as taking "Perocet 7.5mg about five or six tablets a day." (Tr. 43). Nonetheless, Dr. Sabio noted that claimant was "able to provide all the details of his history, and that his memory appeared adequate in that respect." (Tr. 43).

Further, Samuel Goots, Ph.D. provided an evidence-based psychological evaluation of the claimant, finding that claimant "evidenced only mild limitation of daily activities, moderate limitation of social functioning, moderate limitation of concentration, persistence, or pace, and no episodes of decompensation." (Tr. 43). Dr. Goots also found "no marked limitations with regard to claimant's work-related capabilities." (Tr. 43).

The opinion of Dr. Stewart does not contradict the ALJ's conclusion. Acknowledging the fact that claimant had a substance abuse problem, the psychologist opined that "it is undetermined at this time whether his disorders are related to his substance abuse." This opinion is not inconsistent nor does it conflict with the ALJ's determination that Claimant's substance addiction is material to his disabilities. Dr. Steward also stated in his assessment that "claimant's mental impairments imposed no more than mild limitation upon his daily activities or social functioning, and no more than moderate limitation on his concentration." (Tr. 44). This opinion is consistent with other substantial evidence of record used by ALJ in making his RFC determination, particularly the psychological evaluation of Dr. Goots stated above. (Tr. 43). Therefore, the ALJ properly weighed the medical opinions of record.

### 4. Residual Functional Capacity

Claimant asserts that ALJ failed to express Claimant's mental RFC. Commissioner counters that the ALJ's RFC assessment was correct.

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical

condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  Id.

In the present case, the ALJ determined that "absent the effects of his substance addiction disorder, the claimant has the residual functional capacity to perform a range of sedentary work subject to the following limitations: jobs must afford a sit or stand option, and must not require repetitive bending or overhead reaching; jobs must not entail exposure to hazards, such as dangerous moving machinery or unprotected heights; and jobs must be low stress, entry level, unskilled, routine or repetitive, require no more than one or two step instruction, and should primarily entail working with things rather than people." (Tr. 46). Claimant suggests that the RFC determination is incorrect because the ALJ did not take into consideration the mental RFC's of record, namely assessments by Dr. Atkinson and Dr. Steward. This argument, however is without merit because as discussed above those opinions were properly not granted controlling weight. Therefore, the ALJ properly determined Claimant's RFC.

### 5. Hypothetical

Claimant contends that the ALJ presented an improper hypothetical to the VE.  The Commissioner counters that the ALJ's hypothetical was correct. As previously discussed the ALJ properly determined the Claimant's RFC by examining the evidence presented concerning the Claimant's impairments and mental capacity. The hypothetical presented to the VE was based on

Claimant's RFC. Therefore, the ALJ posed a proper hypothetical to the VE.

<h3 align="center">6. <u>Vocational Expert Testimony</u></h3>

Claimant asserts that the testimony given by the Vocational Expert (VE) was inconsistent with the DOT.  Commissioner counters that there was no apparent conflict with VE's testimony and the DOT.

Claimant argues that the VE's testimony conflicted with the DOT.  The only possible conflict that Claimant mentions is that the DOT does not describe a sit/stand option.  "[T]he DOT does not state whether jobs have a sit/stand option."  <u>Baranich v. Barnhart</u>, 2005 U.S. App. LEXIS 6656, *9 (6th Cir. 2005).  This does not mean that a conflict exists between the DOT and the VE's testimony.   "[T]he VE is permitted to rely on sources other than the DOT in evaluating a hypothetical."  <u>Id</u>. citing 20 C.F.R. § 404.1566(d).  Claimant "is therefore incorrect to argue that the ALJ could not include a sit/stand option when such an option is not indicated in the DOT, as the DOT is only one source to be used in assessing the availability of jobs for the Claimant."  <u>Id</u>. at *13.  The ALJ relied on the VE's testimony that someone with Claimant's RFC could perform the job of surveillance system monitor, type copy examiner, and document preparer.  Therefore, no conflict exists between the VE's testimony and the DOT.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically the ALJ was correct in determining that Claimant's substance addiction was material to the disability issue. Also, the Commissioner is not barred by the doctrine of *res judicata.*  In addition, the ALJ properly weighed the opinions

of Dr. Atkinson and Dr. Steward. Also, the ALJ properly determined Claimant's RFC. In addition, the ALJ posed a proper hypothetical to the VE. Lastly, no conflict exists between the VE's testimony and the DOT.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: June 22, 2005


/s/ James E. Seibert

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE